# United States Court of Appeals
## For the Eighth Circuit

_____

No. 22-3034
_____

Teddy Scott; Melanie Scott

*Plaintiffs - Appellees*

v.

Dyno Nobel, Inc.

*Defendant - Appellant*
_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis
_____

Submitted: November 14, 2023
Filed: July 11, 2024
_____

Before LOKEN, ERICKSON, and GRASZ, Circuit Judges.
_____

LOKEN, Circuit Judge.

Teddy and Melanie Scott (the Scotts)[1] brought this diversity action against Dyno Nobel, Inc. (Dyno), alleging they suffered serious injuries when Teddy was exposed to a cloud of toxic gas negligently emitted from Dyno's nitric acid plant in

_____

[1]We refer to Plaintiffs individually by their first names for clarity. We refer to Plaintiffs together as the Scotts.

Louisiana, Missouri (the LoMo plant). The district court initially granted summary judgment in favor of Dyno, but we reversed. Scott v. Dyno Nobel, Inc., 967 F.3d 741 (8th Cir. 2020) (Scott I). After a ten-day trial, the jury found in favor of the Scotts, awarding Teddy $13,750,000 in compensatory damages and $30 million in punitive damages on his negligence claim and Melanie $3 million in compensatory damages on her derivative loss of consortium claim. Dyno appeals, raising multiple issues. We reverse the award of punitive damages and otherwise affirm.

## I. The Incident at Issue

To produce nitric acid at the LoMo plant, Dyno converts ammonia into nitrogen oxide and nitrogen dioxide (NOx), which the Environmental Protection Agency lists as "Extremely Hazardous Substances" in quantities above their "Threshold Planning Quantity." 40 C.F.R. Pt. 355, Apps. A, B (2008). Water combines with NOx at high pressure to create nitric acid. During this process, among other safety precautions, Dyno emits unconverted NOx gas through a 108-foot stack to prevent exposing nearby people to the toxic gas. Dyno's air permit allows specified levels of NOx emissions from the stack during normal operations. These emissions caps do not apply during Dyno's post-maintenance startups, when emissions contain higher concentrations of NOx and become more opaque, appearing yellow, red, or brown in color. Dyno typically conducts startups during early morning hours, when persons are unlikely to be visiting or working at neighboring facilities, and notifies the Missouri Department of Natural Resources of its startup plan. Dyno avoids starting up if the wind is blowing toward the Calumet synthetic lubricant plant located next to the LoMo plant. See Scott I, 967 F.3d at 743-44.

On March 20, 2015, Dyno began a startup at 3:30 a.m. following a shutdown for routine maintenance. At 5:30 a.m., an equipment failure shut the plant down again. After repairs, Dyno reinitiated the startup after 8:00 a.m., during working hours at Calumet. That morning, Teddy was working at the Calumet plant as general

foreman of a crew, working at ground level outside the Calumet plant with numerous other Calumet contractors on a project to expand Calumet operations. Around 8:20 a.m., a member of Teddy's crew noticed a "reddish brown, kind of orangish cloud" coming from Dyno's stack a few hundred feet away. Teddy confirmed that a massive cloud was coming from Dyno's property and directed his crew to evacuate the area.

The crew initially believed the wind was blowing away from Calumet, taking the dark cloud with it. But they noticed a shift in the wind, "like a rogue gust," redirecting the cloud towards Calumet. Teddy, enveloped by the cloud, became "disoriented," with his throat and nose "burning instantly." Teddy and other affected workers went to the hospital, where emergency room staff made them take decontamination showers. Since then, Teddy has seen numerous doctors. He has been diagnosed with irritable larynx syndrome, which causes laryngeal spasms. He suffers from headaches and back pain resulting from falling when he lost consciousness. He has not worked since March 20, 2015. His inability to work and interact with Melanie and their children has caused him to struggle mentally.

## II. Procedural History

The Scotts filed the complaint against Dyno in federal court in 2016, alleging negligence and loss of consortium under Missouri law. After discovery, Dyno moved for summary judgment. Under Missouri law, "[i]n any action for negligence, the plaintiff must establish that the defendant had a duty to protect the plaintiff from injury, the defendant failed to perform that duty, and the defendant's failure proximately caused injury to the plaintiff." Lopez v. Three Rivers Elec. Coop., Inc., 26 S.W.3d 151, 155 (Mo. banc 2000). Dyno argued it had no legal duty to protect Teddy from the injury he suffered because in all the years it had operated the LoMo plant, "no one has ever been injured by, or claimed to have had any health issues arising out of, emissions from a startup until this case. Certainly, no one has ever seen or heard allegations of a plume behaving in the manner described in this case."

-3-

The district court granted the motion for summary judgment, accepting this argument "as establishing that Dyno owed Teddy Scott no duty of care, a question of law." Scott I, 967 F.3d at 744.

The Scotts appealed. We reversed. Our reasoning is essential to this appeal, as it established Missouri law of the case for the district court on remand:

> [W]hether a defendant owed a duty to a particular plaintiff depends in part on whether the risk in question was foreseeable. "Foreseeability for purposes of establishing whether a defendant's conduct created a duty to a plaintiff depends on whether the defendant should have foreseen a risk in a given set of circumstances."

Id. at 744-45, citing and quoting Lopez, 26 S.W.3d at 156. "[I]n this case, foreseeability turns on Dyno's conduct in emitting NOx gas from a 108-foot smokestack above the Calumet worksite on the day in question." Id. at 745. Though whether a duty of care exists is a question of law -

> In Lopez, the [Supreme] Court [of Missouri] explained . . . that "[i]n some cases, the jury may be charged with determining whether facts exist that may give rise to a finding of foreseeability, and, in turn, duty." 26 S.W.3d at 156 n.1. In other words, as we understand this footnote, if duty turns on foreseeability, and varying inferences are possible, *the issue is one for a jury*.

Id. at 746 (emphasis added). Based on the summary judgment record, we reversed the grant of summary judgment and remanded for further proceedings, concluding that "a reasonable jury could find that the circumstances of the emissions in this case created 'some probability or likelihood of harm sufficiently serious that ordinary persons would take precautions to avoid it.'" Id. at 747, quoting Lopez, 26 S.W.3d at 156. We briefly reviewed some of the disputed circumstances in the summary judgment record that could lead a reasonable jury to find some probability of harm,

-4-

making clear we were not weighing or attempting to weigh the parties' disputed contentions. Id. at 747-48.

On remand, the case proceeded to trial. Both Teddy and Melanie testified. The parties called numerous experts, Dyno employees, Calumet employees, members of Teddy's crew, and friends of the Scotts to testify. At the close of the Scotts' evidence and again at the close of all evidence, Dyno moved for a directed verdict on the negligence claim, arguing there was (1) no submissible case of foreseeability, (2) no evidence established the governing standard of care, and (3) no evidence that directly linked the claimed injuries to exposure to Dyno's emissions. The district court denied both motions and denied Dyno a directed verdict on the Scotts' claim for punitive damages. After a jury instructions conference and lengthy closing arguments, the jury returned a verdict awarding the Scotts compensatory and punitive damages on Teddy's negligence claim and compensatory damages on Melanie's derivative loss of consortium claim.

Dyno filed post-trial motions for judgment as a matter of law or a new trial, renewing the arguments made in its original motion. It also moved for a new trial based on alleged legal and evidentiary errors: (1) submitting a verdict director instruction that failed to instruct on foreseeability and improperly instructed on breach; (2) excluding Dyno's evidence of prior startups that did not result in ground-level emissions; (3) admitting the testimony of the Scotts' chemical engineering expert, Jennifer Morningstar; and (4) admitting evidence regarding the lack of NOx abatement technology at the LoMo plant. The district court denied both motions. This appeal followed.

### III. Discussion

A. Whether the Scotts Failed to Prove Foreseeability and Dyno's Duty of Care.
"Under Missouri law, to establish a claim for negligence, a plaintiff must prove three

principal elements: (1) the existence of a duty on the part of the defendant to protect the plaintiff from injury, (2) a failure of the defendant to perform that duty, and (3) an injury proximately caused by the defendant's failure." Howard v. Mo. Bone & Joint Ctr., Inc., 615 F.3d 991, 996 (8th Cir. 2010) (quotation omitted). On appeal, Dyno attacks the post-verdict denial of judgment as a matter of law, arguing the Scotts failed to prove all three elements of Teddy's negligence claim. The issues are thrown at us helter-skelter with little regard for our opinion in Scott I. We will begin with the most difficult element in this case, the issue of foreseeability and Dyno's duty of care. "We review the denial of a renewed motion for judgment as a matter of law de novo, viewing the evidence in a light most favorable to the jury's verdict." Adeli v. Silverstar Auto., Inc., 960 F.3d 452, 458 (8th Cir. 2020). The motion should be granted "only when all of the evidence points one way and is susceptible of no reasonable inference sustaining the position of the nonmoving party." Jacobson Warehouse Co. v. Schnuck Mkts., Inc., 13 F.4th 659, 679 (8th Cir. 2021) (quotation omitted). Where "the evidence presents a sufficient disagreement," the district court must submit the issue to the jury. Id. (quotation omitted).

"A duty is a requirement to conform to a standard of conduct for the protection of others against unreasonable risks." Pierce v. Platte-Clay Elec. Coop., Inc., 769 S.W.2d 769, 771 (Mo. banc 1989). "In the absence of a particular relationship recognized by law to create a duty, [such as the doctor-patient relationship,] the concept of foreseeability is paramount in determining whether a duty exists. . . . For purposes of determining whether a duty exists . . . foreseeability [is] the presence of some probability or likelihood of harm sufficiently serious that ordinary persons would take precautions to avoid it." Lopez, 26 S.W.3d at 156. In Scott I, we determined that foreseeability is a jury issue in this case.[2]

_____

[2]Dyno asserts that "[t]he district court's difficulty in submitting the issue of foreseeability illustrates" that our interpretation of footnote 1 in Lopez was wrong because "foreseeable risk and duty of care . . . has been a question for the court" under Missouri law. That assertion, fully discussed in Scott I, was not included in the

Dyno argues the Scotts submitted insufficient evidence to establish duty and foreseeability and therefore the district court erred in denying Dyno's motion for judgment as a matter of law. Reviewing the evidence at trial in the light most favorable to the verdict, we conclude the jury was presented sufficient information to find that the circumstances on March 20, 2015 created a foreseeable risk of ground-level exposure of hazardous NOx emissions to persons outdoors at the Calumet plant, including Teddy. "[I]t is immaterial that the *precise* manner in which the injury occurred was neither foreseen nor foreseeable." Pierce, 769 S.W.2d at 776 (emphasis in original).

There was undisputed evidence that Dyno knew NOx gas is hazardous and took substantial efforts to prevent exposing other persons, including its employees, to NOx emissions; that the danger increases as the concentration of NOx increases; and that stack emissions have significantly higher concentrations during startups and shutdowns. The Scotts introduced substantial evidence that Dyno knew that persons working outdoors at Calumet were within the class of people that could be harmed by NOx emissions from Dyno's stack, based on the proximity of the Calumet site to Dyno's LoMo plant. Dyno's Health, Safety, Environment and Community Management System instructed employees to consider "communities and other businesses in close proximity to our facilities" when identifying risks. Dyno workers testified that Dyno provided emergency safety sheets to Calumet. Yet Dyno did not monitor emissions during startups and never alerted Calumet that stack emissions contain higher concentrations during startups and shutdowns.

There was also substantial, albeit disputed, evidence that weather conditions present on March 20, 2015 -- cool and cloudy with high humidity -- created a higher likelihood of emissions falling to ground-level from Dyno's stack. Much of the

statement of issues presented. Neither party cites any recent Missouri appellate opinion that alters or disagrees with our interpretation of Lopez.

Scotts' evidence on the effects of weather and temperature was presented by their expert witness, Jennifer Morningstar. The district court rejected Dyno's repeated attempts to have Ms. Morningstar's testimony precluded or rejected because she was not qualified and her background and methodology were flawed or inadequate, issues Dyno does not raise on appeal. Rather, Dyno argues that Ms. Morningstar's trial testimony regarding ground-level exposure factors "did not address the probability or likelihood of such an impact," as our opinion in Scott I anticipated, 967 F.3d at 747, and therefore cannot support a finding of foreseeability. "Although foreseeability is forward-looking," Dyno argues, "Morningstar conducted her analysis using hindsight."

We disagree with Dyno's characterization of Ms. Morningstar's testimony. Ms. Morningstar, a professional engineer in chemical engineering, structured her analysis around an industry safety hierarchy, "the overlying engineering principle" that chemical engineers use to address hazards: if possible, eliminate the hazard through design; if elimination is not possible, control the hazard; if the hazard cannot be controlled, warn people of the hazard and consider the use of personal protective equipment. Ms. Morningstar identified acts that an ordinarily careful chemical manufacturer must take to manage the risk of its emissions, pursuant to the safety hierarchy, based on thermodynamics, the physical properties of NOx, and topography. Dyno's own documents and witnesses agreed on the accepted use of the safety hierarchy, and the actions it required were listed in the verdict director. This was sufficient to set forth the standard of care to which Dyno would be held.

Dyno's argument on appeal repeatedly emphasizes the absence of prior NOx exposure incidents at the LoMo plant. The district court relied on this undisputed fact in granting summary judgment, reasoning that legal duty is an issue of law. Id. at 744-45. But our divided panel concluded in Scott I that under Missouri law foreseeability determines the issue of legal duty and is an issue for the jury in this case. "Although there was no evidence that emissions of NOx gas from the Dyno

-8-

smokestack previously had caused injury to workers at the nearby Calumet site, a reasonable jury could find that the *circumstances of the emissions in this case* created 'some probability or likelihood of harm sufficiently serious that ordinary persons would take precautions to avoid it.'" Id. at 747 (emphasis added), quoting Lopez, 26 S.W.3d at 156.[3]

Foreseeability analysis under Missouri law does not require plaintiff to establish with mathematical precision the probability of harm, only that there exists "some probability of sufficient moment to induce the reasonable mind to take the precautions which would avoid it." Lopez, 26 S.W.3d at 156 (quotation omitted). "It is not our task to weigh these disputed fact contentions . . . . We only conclude that a reasonable jury could find that the combination of circumstances created some probability of harm to Calumet workers sufficiently serious that ordinary persons would take precautions against it." Scott I, 967 F.3d at 747-48. After careful review of the trial record, we conclude the district court did not err in submitting this issue to the jury and denying Dyno's post-verdict motion for judgment as a matter of law.

B. Whether the Scotts Failed to Prove Causation. Dyno further argues the Scotts failed to establish the necessary causal connection between Dyno's alleged failure to "consider the weather" and Teddy's injuries. This contention is without merit. "A submissible case is made if substantial evidence is presented that shows the injury is a natural and probable consequence of a defendant's negligence. Absent compelling evidence which establishes the absence of causation, the causation question is for the jury." Howard, 615 F.3d at 996 (citations and quotations omitted).

---

[3]Other courts have held that an absence of previous accidents is not dispositive on the issue of foreseeability; "the absence of prior accidents may simply mean that the plaintiff was the first to be injured; there is always a first victim." Forrest v. Beloit Corp., 424 F.3d 344, 357 (3d Cir. 2005).

According to Dyno, the Scotts submitted no evidence that "consideration" of the weather would have impacted Dyno's decision to start up the LoMo plant. But the standard is what an ordinarily careful and prudent nitric acid manufacturer would have done under the circumstances. If low cloud cover could prevent NOx emissions from rising, as Ms. Morningstar testified, a reasonable jury could find that an ordinarily careful manufacturer would delay a startup if weather conditions increased the likelihood that emissions would fall to ground level, creating a risk to employees and others known to be working nearby. See Freight House Lofts Condo Ass'n v. VSI Meter Servs., Inc., 402 S.W.3d 586, 599 (Mo. App. 2013) ("If the logical conclusion from the evidence is that if certain things had been done certain results would not have occurred, and such results did occur, the evidence of causation is sufficient.") (quotation omitted).

C. Verdict Director Instruction Issues. The district court submitted the issue of foreseeability to the jury in two parts. First, Instruction 17, the verdict director, provided:

Your verdict must be for plaintiffs if you believe:

First, defendant breached its duty of care by either:
        failing to wait to startup its plant until after working hours, or
        failing to follow its work procedures, or
        failing to consider the weather conditions before starting up its
          plant, or
        failing to continuously watch its smoke during the startup, or
        failing to warn its neighbors about the dangers of its emissions
          before the startup.

Second, defendant, in any one or more of the respects submitted in paragraph First, was thereby negligent, and

Third, as a direct result of such negligence, plaintiffs sustained damages.

-10-

Your verdict must be for defendant and against plaintiffs unless you believe defendant breached its duty of care, was negligent, and plaintiffs sustained damages as a direct result of such negligence.

Second, the jury was required to answer a special interrogatory before rendering their general verdict:

Did the circumstances on March 20, 2015, create some probability of harm to someone on a neighboring facility sufficiently serious that ordinary persons would take precautions to avoid it?

Dyno argues the district court erred in denying its post-verdict motion because of multiple errors in Instruction 17 and the special interrogatory.

"We review the jury instructions given by a district court for an abuse of discretion. Our review is limited to whether the jury instructions, taken as a whole, fairly and adequately represent the evidence and applicable law in light of the issues presented to the jury in a particular case." Brown v. Sandals Resorts Int'l, 284 F.3d 949, 953 (8th Cir. 2002) (citation and quotation omitted). "[B]efore a litigant is entitled to any relief on the ground that the trial court erred in giving or not giving an instruction, the error must be prejudicial." Townsend v. Bayer Corp., 774 F.3d 446, 463 (8th Cir. 2014) (quotation omitted). "In this diversity action, Missouri law applies to the substance of the instructions. Federal law governs the review of the discretion exercised in refusing or admitting such instructions." Am. Mod. Home Ins. Co. v. Thomas, 993 F.3d 1068, 1072 (8th Cir. 2021) (citation and quotations omitted).

1. Dyno argues the court's instructions "improperly assumed Dyno owed a duty of care." This contention is without merit. In Scott I, we noted that the "summary judgment record contains overwhelming evidence that Dyno had actual knowledge," confirmed by its own extensive safety precautions, that discharging unconverted NOx gas creates a risk of injury to nearby persons. 967 F.3d at 745. The evidence at trial

-11-

was no different.  This established a *general* common law duty of care.  The issue at trial was foreseeability -- whether there was sufficient likelihood that in this particular situation Dyno's duty extended to a class of persons that included Teddy Scott.  See Alcorn v. Union Pac. R.R. Co., 50 S.W.3d 226, 238 (Mo. banc 2001).

2.  Dyno argues the district court erred because Instruction 17 did not instruct the jury to make a determination of foreseeability.  We agree Instruction 17 was at least ambiguous in this regard.  But an "erroneous instruction will not necessarily require reversal if the error was cured by a subsequent instruction or by consideration of the entire charge." Hrzenak v. White-Westinghouse Appliance Co., 682 F.2d 714, 719 (8th Cir. 1982).  Here, the special interrogatory clearly submitted the factual question of foreseeability to the jury and did so consistent with substantive Missouri law -- indeed, it used the precise foreseeability language used by the Supreme Court of Missouri and cited by this Court in Scott I.  967 F.3d at 747, quoting Lopez, 26 S.W.3d at 156.  In discussing the instructions and verdict form that would be presented to the jury, both parties and the district court understood the special interrogatory asked the foreseeability question.  The district court did not erroneously omit the essential element of duty of care.  It "simply bifurcated the issue of [duty], submitting the factual component of the issue to the jury via special verdict form, and reserving the legal determination for itself." Wilkins v. St. Louis Hous. Auth., 314 F.3d 927, 934 (8th Cir. 2002).[4]

---

[4]Use of such a procedure is not unusual in this circuit.  See Littrell v. Franklin, 388 F.3d 578, 585-86 (8th Cir. 2004) (upholding use of special interrogatories for "jury to make any requisite factual findings that the district court may then rely upon to make its own qualified immunity ruling"); Nagel v. City of Jamestown, 952 F.3d 923, 929 (8th Cir. 2020) (whether public employee speech is protected by the First Amendment is a question of law for the court, but "[u]nderlying factual disputes concerning whether the plaintiff's speech is protected should be submitted to the jury through special interrogatories or special verdict forms").  So long as the charge read as a whole accurately submitted the issues, it is "plainly within the district court's discretion to have the jury make this factual finding by use of a special interrogatory."

3. Dyno contends that the special interrogatory "provided too little, too late." Because Instruction 17 appeared before the special interrogatory in sequence, the special interrogatory "cannot overcome the errors in the instruction actually directing the jury on how to reach its verdict." We disagree. In reaching a verdict for the Scotts, the jury was required to find foreseeability by answering "yes" to the special interrogatory *before* proceeding to the general verdict. Immediately after the special interrogatory, the verdict form plainly stated: "If you answer 'No,' stop here and sign the verdict form. If you answer 'Yes,' complete the remainder of the verdict form."

We held in Scott I that, *in this case*, the question of duty turned on foreseeability, and because "the question of foreseeability [was] subject to varying inferences," it was "therefore an issue for a jury." 967 F.3d at 746-47. Instruction 17 and the special interrogatory asked the jury to make a factual finding on foreseeability, which established Dyno's duty of care as a matter of law. In these circumstances, the district court did not need to make a separate determination of legal duty. Cf. Creative Cookware, Inc. v. Northland Aluminum Prods., Inc., 678 F.2d 746, 748 n.4 (8th Cir. 1982).

4. Dyno expresses concern that "the jury effectively was instructed to answer 'yes' to the interrogatory." But even if the sequencing of Instruction 17 and the special interrogatory was "no model of clarity," we cannot say the jury was so misled as to prejudice Dyno. Wurster v. Plastics Grp., Inc., 917 F.3d 608, 616 (8th Cir. 2019). In closing argument, Dyno's counsel urged the jury to "start with the verdict form itself." In addressing the elements of Teddy's negligence claim, counsel argued: "The foreseeability question -- again, it's on the special verdict form -- and if you answer it no, then your deliberations are over." Counsel summarized the "evidence regarding foreseeability" and argued the appropriate answer on foreseeability was no.

---

Kostelec v. State Farm Fire & Cas. Co., 64 F.3d 1220, 1227 (8th Cir. 1995), citing Fed. R. Civ. P. 49(b).

We rarely find prejudice when the objecting party discussed the objected-to instruction, or both parties properly explained the instruction, in closing argument. See, e.g., Prop. Tax Rsch. Co. v. Falstaff Brewing Corp., 708 F.2d 1333, 1337 (8th Cir. 1983). Viewing the charge as a whole in the context of counsel's closing argument, we conclude the jury was not "misled in any way and . . . had understanding of the issues and its duty to determine those issues." Crump v. Versa Prods., Inc., 400 F.3d 1104, 1108 (8th Cir. 2005) (quotation omitted).

5. Dyno complains that the special interrogatory failed to tell the jury how to answer the question and why it had to do so, an issue it did not raise in the district court. A district court "need give the jury only such explanation and instructions as may be necessary to enable the triers of fact to make intelligent findings." Walther v. Omaha Pub. Power Dist., 412 F.2d 1164, 1170 (8th Cir. 1969); see Fed. R. Civ. P. 49(b)(1). Even if the issue was not waived, there was no plain error. See Horstmyer v. Black & Decker, (U.S.), Inc., 151 F.3d 765, 770-71 (8th Cir. 1998).

6. Dyno argues that the five "failings" listed in Instruction 17's paragraph on breach left the jury "to decide only whether Dyno complied with Morningstar's practices -- without having to reach the highly controverted issue of whether those practices *actually* defined the requisite level of care." We disagree. The next paragraph asked the jury to determine if they believed that Dyno, "in any one or more of the respects submitted in" the preceding paragraph, "was thereby negligent." "Under this instruction, the jury could find for [Dyno] if . . . they . . . believed that [Dyno] was not negligent." Ostrander v. O'Banion, 152 S.W.3d 333, 339 (Mo. App. 2004).

7. Dyno argues that the five failings listed in Instruction 17's paragraph on breach are so broad and vague as to make them "unworkable as a basis for breach" and some are not supported by sufficient evidence to establish that Dyno breached a duty of care. Before the district court, Dyno called this instruction a "roving

-14-

commission," that is, one "that allows the jury to roam freely through the evidence and choose any facts which suit[] its fancy or perception of logic to impose liability." Bauer v. Curators of Univ. of Mo., 680 F.3d 1043, 1046 n.2 (8th Cir. 2012) (quotation omitted). The district court rejected this argument, noting that the failings "were testified to as part of the evidence in the case, and so . . . the traditional concept of the roving commission [was] inhibited." We agree. While the references to "work procedures" and "weather conditions" may seem vague, "[t]he issue is whether the phrase as used in the verdict director was misleading in the context of the evidence at trial." Klotz v. St. Anthony's Med. Ctr., 311 S.W.3d 752, 767 (Mo. banc 2010). Here, by the end of the ten-day trial, the testimony of numerous fact and expert witnesses plus the documentary evidence had thoroughly explained to the jury what each "failing" referred to. See Williams v. Mercy Clinic Springfield Cmtys., 568 S.W.3d 396, 414-15 (Mo. banc 2019).

D. Exclusion of Prior Startup Evidence. Dyno argues the district court abused its discretion by excluding evidence that NOx emissions from Dyno's stack had never before sunk to the ground. Before trial, the court granted the Scotts' motion *in limine* to exclude evidence of "any other similar startups that were 'safe' at the LoMo plant." Dyno raised the issue at trial and made an offer of proof in which Donald Moore testified that in his many years working as an Acid A Operator at the LoMo plant he had experienced approximately 150 to 200 startups "at many different times of year and many different times of day," including numerous interrupted startups, none of which resulted in ground-level emissions. Questioned by counsel for the Scotts, Moore admitted he was unable to provide a specific date on which a similar startup occurred and did not bring to court documentation regarding these prior startups. The district court acknowledged that the Scotts had opened the door at trial but excluded this evidence as an insufficient showing of similarity. "I think there has to be some showing of a substantial similarity in order to allow the witness to testify in the fashion that you want [him] to testify."

We review the district court's exclusion of evidence for a clear and prejudicial abuse of discretion May v. Nationstar Mortg., LLC, 852 F.3d 806, 819 (8th Cir. 2017). "An abuse of discretion occurs when the district court erroneously excludes admissible evidence and there is no reasonable assurance that the jury would have reached the same conclusion had the evidence been admitted." Id.

In negligence cases, Missouri courts distinguish between evidence of prior incidents and evidence of an absence of prior incidents. "[A]lthough the general rule is that proof of the absence of other accidents is not admissible because it raises collateral issues which have a tendency to confuse and mislead the jury, there is no 'absolute rule' and much is left to the discretion of the trial court." McJunkins v. Windham Power Lifts, Inc., 767 S.W.2d 95, 97-98 (Mo. App. 1989); see Johnson v. Kan. City Pub. Serv. Co., 228 S.W.2d 796, 797-99 (Mo. 1950). The court in McJunkins noted that "the recent trend is toward admissibility of proof of the absence of other accidents to show . . . 'the nonexistence of an unduly dangerous situation.'" 767 S.W.2d at 98-99, quoting 1 E. Cleary, et al., McCormick on Evidence § 200, pp. 591-92 (3d ed. 1984), and citing numerous cases from other jurisdictions. That same year, the Supreme Court of Missouri cited this passage from McJunkins in Pierce, 769 S.W.2d at 774. More recently, the Missouri Court of Appeals held that, for evidence of the absence-of-prior-accidents to be admissible, the proponent must establish a proper foundation by showing "that no accident occurred under conditions substantially similar to those faced by plaintiff and that an adequate number of those situations occurred to make the absence of accidents meaningful," an issue "primarily within the discretion of the trial court." Heitman v. Heartland Reg'l Med. Ctr., 251 S.W.3d 372, 376 (Mo. App. 2008) (citations and quotation omitted). This is the standard applied by the district court in excluding the evidence proffered by Dyno at trial.

We can agree with Dyno that evidence of a lack of incidents from prior startups might be relevant to the issue of foreseeability. Indeed, as Dyno argues, our opinion

-16-

in Scott I noted the lack of previous incidents as a factor in our decision that, based on the summary judgment record, the question of foreseeability was subject to varying inferences. 967 F.3d at 747. But we did not rule that prior startup evidence would *necessarily* be admissible at trial. Cf. Gannon Int'l, Ltd. v. Blocker, 684 F.3d 785, 793 (8th Cir. 2012) (Evidence to be considered at the summary judgment stage need not be in an admissible form so long as it "*could* be presented at trial in an admissible form") (emphasis in original). Dyno as the proponent of that evidence must establish a proper foundation by showing that specific absence-of-prior-accidents evidence was relevant and admissible in the defense of Teddy's negligence claim. See Drabik v. Stanley-Bostitch, Inc., 997 F.2d 496, 508 (8th Cir. 1993).

Even looking beyond Missouri appellate court decisions, the standard applied by the district court in excluding Dyno's proffered evidence is well-established. "Similar incident evidence is admissible *only if* the incidents 'occurred under circumstances substantially similar to those at issue in the case at bar.'" Adams v. Toyota Motor Corp., 867 F.3d 903, 913 (8th Cir. 2017) (emphasis added), quoting Hale v. Firestone Tire & Rubber Co., 756 F.2d 1322, 1332 (8th Cir. 1985). At a minimum, evidence of an accident-free history requires the same showing of substantial similarity of circumstances. See Sturm v. Clark Equip. Co., 547 F. Supp. 144, 145 (W.D. Mo. 1982), aff'd, 732 F.2d 161 (8th Cir. 1984) (unpublished table decision); 1 R. Mosteller et al., McCormick on Evidence § 200.5 (8th ed. 2022); Forrest, 424 F.3d at 355-57 (collecting cases).

The substantial similarity analysis is "case-specific" and fact-intensive. Adams, 867 F.3d at 913. Dyno's proffer failed to provide *any* substantive details on the circumstances surrounding specific prior startups. The Scotts' theory of liability was focused, in part, on Dyno's failure to account for the effect weather would have on emissions during startup, specifically that the low cloud cover, cool temperatures, and light wind on March 20, 2015 created conditions in which emissions reaching ground level were foreseeable. Dyno's proffered evidence failed to allege any

similarities between the weather on March 20, 2015 and that on any other startup day, so it was not admissible. See Chism v. CNH Am. LLC, 638 F.3d 637, 642 (8th Cir. 2011). We agree with the district court's conclusion that Dyno's proffer of prior startup evidence made an "insufficient" showing of substantial similarity. The court did not abuse its wide discretion in excluding this evidence.[5]

E. Punitive Damages. Dyno argues the district court erred in submitting the issue of punitive damages to the jury because the Scotts failed to make a submissible case for punitive damages under Missouri law. "Whether there is sufficient evidence to support an award of punitive damages is a question of law" we review *de novo*. Rhoden v. Mo. Delta Med. Ctr., 621 S.W.3d 469, 477 (Mo. banc 2021) (quotation omitted); see May, 852 F.3d at 814.

The purpose of punitive damages is to punish and deter. "As such, punitive damages are an extraordinary and harsh remedy that should be awarded sparingly." May, 852 F.3d at 814; see Rodriguez v. Suzuki Motor Corp., 936 S.W.2d 104, 110 (Mo. banc 1996). "[P]unitive damages require a showing of a culpable mental state on the part of the defendant, either by a wanton, willful or outrageous act or reckless disregard (from which evil motive is inferred) for an act's consequences." Burnett v. Griffith, 769 S.W.2d 780, 787 (Mo. banc 1989). Punitive damages "are not generally recoverable in negligence actions because negligence, a mere omission of the duty to exercise care, is the antithesis of willful or intentional conduct." Dodson v. Ferrara, 491 S.W.3d 542, 563 (Mo. banc 2016) (quotation omitted). However, "punitive damages can be awarded in a negligence action but only when the

---

[5]We also agree with the Scotts that Dyno was not prejudiced by this exclusion. The jury heard testimony about the lack of previous incidents at the LoMo plant, which counsel repeatedly referenced in Dyno's closing argument. Thus, we are reasonably assured that the verdict would not be different had the district court admitted the evidence. See May, 852 F.3d at 819; Wilfing v. Gen. Motors Corp., 685 F.2d 1049, 1052 (8th Cir. 1982).

defendant knew or had reason to know that there was a *high degree of probability* that the action would *result in injury*." Hoover's Dairy, Inc. v. Mid-Am. Dairymen, Inc., 700 S.W.2d 426, 436 (Mo. banc 1985) (emphases in original). A "submissible case for punitive damages requires clear and convincing proof that the defendant intentionally acted either by a wanton, willful or outrageous act, or reckless disregard for an act's consequences (from which evil motive is inferred)." Rhoden, 621 S.W.3d at 481 (quotation omitted).

To prove the culpable mental state required, a plaintiff must demonstrate that "the defendant showed a complete indifference to or conscious disregard for the safety of others." Id. (quotation omitted). In negligence cases, "conscious disregard or complete indifference" is:

> an act or omission, though properly characterized as negligent, [that] manifest[s] such reckless indifference to the rights of others that the law will imply that an injury resulting from it was intentionally inflicted. Or there may be conscious negligence tantamount to intentional wrongdoing, as where the person doing the act or failing to act must be conscious of his conduct, and, [though] having no specific intent to injure, must be conscious, from his knowledge of surrounding circumstances and existing conditions, that his conduct will naturally or probably result in injury.

Alack v. Vic Tanny Int'l of Mo., Inc., 923 S.W.2d 330, 339 (Mo. banc 1996) (quotation and emphasis omitted). "[C]areful judicial scrutiny is needed to determine whether the conduct was so egregious that it was tantamount to intentional wrongdoing." Alcorn, 50 S.W.3d at 248 (quotation omitted).

Dyno argues the evidence the Scotts submitted failed to meet this high standard. We agree. Though the question is close because NOx emissions are extremely hazardous to anyone who is exposed to them, we conclude that "complete

indifference to or conscious disregard for the safety of others is conduct that is just beyond the horizon of the pattern of evidence in this case." Roth v. Black & Decker, U.S., Inc., 737 F.2d 779, 782 (8th Cir. 1984).

The lack of prior emission incidents at the LoMo plant, the fact that Dyno's federal Environmental Protection Agency (EPA) permit allowed the release of emissions on March 20, and the fact that Dyno's conduct did not otherwise violate any regulation or applicable statute are factors that "[w]eigh[] against submission of punitive . . . damages." Lopez, 26 S.W.3d at 160. The trial record is not so one-sided on this issue as Dyno asserts. While mere awareness of the risk to safety from exposure to hazardous NOx gas emissions is insufficient to support punitive damages, the Scotts did not rest their claim for punitive damages solely on the known dangers of NOx emissions. Expert Morningstar testified that Dyno did not follow risk management procedures called for by the safety hierarchy, a well-recognized industry safety standard. That was evidence at least suggesting conscious disregard for the safety of others.

The Scotts also introduced evidence that, at the time of Teddy's injury, the LoMo plant was Dyno's only nitric oxide plant without NOx abatement technology that "eliminates 98 percent of the nitrogen dioxide and other NOx gas in a plant's emissions." However, Dyno employees testified that Dyno did not install this technology because the EPA did not require installation in plants built before 1980. Conformity with a regulatory process "does not relieve [Dyno] of liability in negligence [but] . . . does negate the conclusion that [Dyno's] conduct was tantamount to intentional wrongdoing." Alcorn, 50 S.W.3d at 249.

While the Scotts submitted sufficient evidence to prove the elements of their negligence claim, what is missing is evidence Dyno acted with "such reckless indifference to the rights of others that the law will imply that an injury resulting from it was intentionally inflicted." Alack, 923 S.W.2d at 339. Nor was there evidence

Dyno "knew or had reason to know that there was a *high degree of probability* that [its startup] action would *result in injury*." Hoover's Dairy, 700 S.W.2d at 436 (emphasis in original). Without proof of the mental state that has long been required for the recovery of punitive damages under Missouri law, the award of punitive damages in this case must be reversed. Therefore, we need not consider Dyno's alternative argument that the award of $30 million in punitive damages is grossly excessive and thus violates the Due Process Clause of the Fourteenth Amendment. See generally BMW of N. Am., Inc. v. Gore, 517 U.S. 559 (1996).

## IV. Conclusion

The judgment of the district court is affirmed in part, and the case is remanded for entry of an amended judgment omitting the award of $30,000,000 of punitive damages on Teddy Scott's negligence claim.

_____